UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

DOUGLAS BELLMORE,                    )
                                     )
                Plaintiff            )
                                     )
        v.                           ) Case No. 4:08 cv 94
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security      )
                                     )
                Defendant            )

OPINION AND ORDER

This matter is before the court on the plaintiff's petition for judicial review of the decision of the Commissioner of Social Security filed by the plaintiff, Douglas Bellmore, on February 23, 2009.  For the reasons set forth below, the decision of the Commissioner is **AFFIRMED.**

Background

The plaintiff, Douglas Bellmore, applied for Disability Insurance Benefits on April 12, 2005, alleging a disability onset date of January 9, 2002.  (Tr. 22)  His claim initially was denied on July 21, 2005, and again denied upon reconsideration on September 1, 2005.  (Tr. 99)  Bellmore also applied for Supplemental Security Income on July 21, 2006.  (Tr. 22)  Bellmore requested a hearing before an Administrative Law Judge on July 21, 2006.  (Tr. 22)  A hearing before ALJ Dennis R. Kramer was held on September 4, 2007, at which Bellmore, medical expert Ashok G. Jilhewar, M.D., and vocational expert Thomas A Grzesik testified. (Tr. 58-96)  On November 29, 2007, the ALJ issued a partially favorable decision.  (Tr 17-31)  The ALJ found that

Bellmore was not disabled under the Social Security Act through June 30, 2005, the date last insured. (Tr. 31) The ALJ found that Bellmore was disabled based on the application for supplementary security income beginning on May 2, 2007. (Tr. 31) Following a denial of his request for review by the Appeals Council on October 14, 2008, Bellmore filed his Complaint in this court on February 23, 2009. (Tr. 5-7, DE 1)

Douglas Bellmore was born on June 11, 1958, making him 51 years old at present. (Tr. 62) He had completed two years of college when the ALJ made his decision. (Tr. 63) Bellmore served in the United States Army from 1975 through 1978. (Tr. 134) After leaving the service, he worked such jobs as a dock worker, a drywall installer, and a restaurant chef. (Tr. 29, 151)

Bellmore's medical problems arose sometime in 1975 when he twisted his right knee while he was stationed in Korea. (Tr. 239) After the injury, he was diagnosed with chondromalacia bilaterally. (Tr. 289) Bellmore had a right knee patellectomy in 1977. (Tr. 224) Bellmore has had five surgeries in total on his right knee. (Tr. 238)

In March 1985, Bellmore began experiencing pain in his left leg and knee because he was placing more weight on his left leg and favoring the right knee. (Tr. 254) X-rays from June 1999 showed degenerative changes in both knees and a fragmented right patella. (Tr. 288-93) Bellmore told doctors that an old MRI done in Chicago had shown ACL tears in the left knee. (Tr. 287)

Doctors determined that Bellmore had a 30 percent disability rating in each knee. (Tr. 288) In August 1999, Bellmore fell again and twisted his left knee and had to use crutches as a result. (Tr. 360-61)

Six months later, in February 2000, Bellmore was able to walk without difficulty, his left knee had full range of motion, and he was assessed as full weight bearing. (Tr. 359) Bellmore also told doctors that he was getting Percocet "on the street" to help relieve pain. (Tr. 359) In March 2000, on a follow up visit in Terre Haute, Indiana, Bellmore complained, "I don't know why I can't just get Percodan for my knees," and the doctor reported the smell of marijuana. (Tr. 358) Bellmore was offered surgery but claimed that he did not feel ready for the surgery. (Tr. 273)

In December 2000, Bellmore complained of discomfort in his knees, ankles, and lower back. (Tr. 284) Bellmore told the doctors that he did not want surgery on his left knee and instead only requested an evaluation for pain relief measures. (Tr. 284) Kyle Demyer, a nurse practitioner, reported that the medical problems facing Bellmore were "obesity and an old injury to the right knee." (Tr. 273) Demyer also reported that Bellmore was a recovering alcoholic. (Tr. 273) In August 2001, Bellmore came to his doctor for a Hepatitis C test after his girlfriend had tested positive. (Tr. 355) At that time, Bellmore denied any intravenous drug use but admitted to smoking approximately one half ounce of marijuana a day and drinking two glasses of wine

per day. (Tr. 355) The doctors advised Bellmore to stop his use
of marijuana, but he refused to do so at that time. (Tr. 356)
Bellmore also refused any assistance for drug rehabilitation.
(Tr. 356)

On January 9, 2002, Bellmore was injured when he drove his
motorcycle into a police car while going approximately 40 miles
per hour. (Tr. 199, 240) AP and lateral views of the lumbar
spine showed a burst fracture of the L3 vertebra with 35 percent
compression. (Tr. 193) There also was minimal retrolisthesis of
L4 on L5, but his alignment was otherwise intact. (Tr. 193) A
lumbar spine CT also found fractures involving the left L3
lamina, L2-3 facet joint, and L2-4 left transverse processes.
(Tr. 195)

In August 2002, Bellmore applied to the Department of
Veteran Affairs for an increased evaluation of his service-
connected bilateral knee disorder and a claim for entitlement to
individual unemployability. (Tr. 134-136) The entitlement to
individual unemployability was denied. (Tr. 134) The VA report
concluded that neither Bellmore's right knee condition nor his
left knee condition had worsened since his last evaluation. (Tr.
135) This report also denied his unemployability claim because
private and VA treatment reports did not show that he was "unable
to secure or follow a substantially gainful occupation due solely
to your service connected disabilities." (Tr. 136) The report
continued that evidence showed that Bellmore was "considered
unemployable due to non-service-connected factors." (Tr. 136)

4

In September 2002, Bellmore was taking no pain medication except for marijuana and did not want "any medication at this time for his discomfort." (Tr. 243-44) He was able to ambulate well without assistance and had a body mass index of 29.5. (Tr. 243) A December 2002 Radiologic Consultation Report by Richard L. Roudebush of the VAMC determined that Bellmore had a chronic L3 vertebral body burst fracture that was causing severe stenosis. (Tr. 249-50)

In November 2003, diagnostic images of his knees showed that Bellmore suffered from osteoarthritis in both knees and a fragmented patella in his right. (Tr. 206) Examination of spinal x-rays detailed a chronic, severe, wedge-shaped compression deformity of the L3 vertebral body. (Tr. 208) These x-rays also showed mild to moderated degenerative disk disease from the L2 vertebra to the L5 vertebra. (Tr. 209) This examination also revealed a moderate facet joint degenerative change at L5. (Tr. 209) Bellmore also was noted to have a decreased range of motion with flexion and lateral flexion of the spine and decreased extension. (Tr. 238) A physician recommended a L1-L4 spinal fusion surgery and decompression. (Tr. 267) Bellmore told the physician that he was not interested in the surgery but would return later. (Tr. 267) At this time, the only medication Bellmore was taking was marijuana for his pain. (Tr. 237) Ramsis Salama, M.D., the VA medical examiner, recommended that the most suitable employment for Bellmore would be something with a desk job that did not require much standing. (Tr. 241-42)

In April 2004, Bellmore again sought treatment for his back and knee pain and reported to the physician that he was treating his pain himself with NSAIDs (non-steroidal anti-inflammatory drugs), narcotics, and recreational marijuana. (Tr. 223) Bellmore also reported that he had no money to purchase marijuana and that he was attempting to get Social Security disability in order to help out his children. (Tr. 233) At this time, doctors determined that Bellmore had lumbar spine tenderness, a positive straight leg test, an inability to bend at the waist, and an alteration to his gait. (Tr. 223, 234) In May 2004, Bellmore was able to cable walk on his heels and had no motor weakness in his extremities. (Tr. 229)

An April 2005 MRI revealed that Bellmore had extensive tears of the medial and lateral menisci of his left knee. (Tr. 200-01) Despite the two large tears in his left knee, Bellmore still was able to do a straight leg raise. (Tr. 227) Bellmore's insured status ended on June 30, 2005. (Tr. 22, 31, 142) In July 2005, Michael W. Kennedy, M.D. examined Bellmore at the request of the Indiana Disability Determination Division. (Tr. 364) Bellmore complained of constant 9 out of 10 or 10 out of 10 pain in his back stemming from his motorcycle accident in 2002. (Tr. 364) Bellmore told Dr. Kennedy that he could sit comfortably for 30-45 minutes and stand for only 30 minutes. (Tr. 364) Dr. Kennedy reported that Bellmore appeared to sit comfortably throughout the exam, although he did have "difficulty lying back and getting up from the recumbent position." (Tr. 364) Bellmore also denied

the use of alcohol or street drugs. (Tr. 364) Upon examination, Bellmore was determined to be 72 inches tall and weighed 240 pounds. (Tr. 365) Dr. Kennedy further determined that Bellmore "ambulates with a normal gait, which is not unsteady, lurching or predictable." (Tr. 365) Bellmore was able to walk on toes, walk on heels, and tandem walk. (Tr. 366) He was able to stand on either leg alone and could perform half of a squat. (Tr. 367) Dr. Kennedy also reported that Bellmore demonstrated positive Waddell signs suggesting symptom magnification or non-organic back pain. (Tr. 367) Dr. Kennedy suggested that Bellmore would be able to work eight hours a day in a seated or standing position, but that he should be able to change positions frequently. (Tr. 367) Dr. Kennedy's report stated that Bellmore could not lift, push, or pull more than 20 pounds occasionally and 10 pounds frequently. (Tr. 367) Finally, the report declared that Bellmore could not bend, squat, crawl, or climb. (Tr. 368)

Also in July 2005, F. Montoya, M.D. reviewed Bellmore's medical records on behalf of the state agency and signed the Disability Determination and Transmittal Form. (Tr. 98) Dr. Montoya determined that Bellmore could lift 20 pounds occasionally and 10 pounds frequently. (Tr. 371) Furthermore, Dr. Montoya wrote that Bellmore could stand and/or walk for a total of six hours in an eight hour work day and that he occasionally could climb, balance, stoop, kneel, crouch, and crawl. (Tr. 371-72) Dr. Montoya determined that Bellmore was not disabled through June 30, 2005. (Tr. 98) One month later, in August

2005, J. Sands, M.D. reviewed Bellmore's medical records and signed off on Dr. Montoya's findings. (Tr. 97)

In January 2006, Bellmore continued to smoke marijuana and reported quitting "meth" two years earlier. (Tr. 395) At this time, he weighed 250 pounds. (Tr. 397) Bellmore complained of back and knee pain but tested 5/5 motor in both of his lower extremities. (Tr. 395) He also scored negative on a straight leg raise test but was determined to have stable knees. (Tr. 395) Michael Gallagher, M.D., the examining physician, informed Bellmore that he might need lumbar fusion in the future to help relieve pain, but he prescribed only anti-inflammatory drugs for his knee pain and requested Bellmore to return in three months. (Tr. 395) Dr. Gallagher determined that compared to a previous examination, there had been no significant change in Bellmore's back. (Tr. 380)

In June 2006, Bellmore asked the VA hospital to write restrictions for his disability application. (Tr. 393) Dr. John Klemme, who treated him that day, advised that Bellmore refrain from lifting anything greater than 10 pounds and also cautioned him to avoid prolonged standing or sitting for more than 30 minutes at a time. (Tr. 393) In November 2006, Bellmore was able to ambulate without assistive device. (Tr. 418) As early as February 6, 2007, Bellmore was requesting a walker from Dr. Klemme. (Tr. 506) On May 2, 2007, Bellmore was issued a rollator walker and cane from a kinesiotherapist at the VA. (Tr. 422)

The hearing before the ALJ was on September 4, 2007, and was held in Gary, Indiana. (Tr. 58) The hearing began with the ALJ questioning Bellmore's attorney about his stipulations to his past work history. (Tr. 62) The ALJ then proceeded to question Bellmore himself about his personal information. (Tr. 63-4) Next the ALJ asked Bellmore about his work history. (Tr. 64-6) The questioning continued with the ALJ asking Bellmore about the levels of pain he felt on a daily basis, on a scale of 1 to 10. (Tr. 75) Finally, the ALJ questioned Bellmore about his daily activities. (Tr. 78-79) Bellmore stated that he lived alone and was able to do his own cleaning and shopping. (Tr. 78-79)

Ashok Jilhewar, M.D., testified as a medical expert, and Thomas A Grzesik testified as a vocational expert. (Tr. 22) Dr. Jilhewar testified that he never had any contact with Bellmore and that he had reviewed only the medical records provided. (Tr. 80) Dr. Jilhewar opined that Bellmore did not meet or equal a listed impairment because of his demonstrated ability to walk on his heels, on his toes, and tandem walk, which was inconsistent with the need for an assistive device. (Tr. 84, 88) Because there were no medical records after June 16, 2006, Dr. Jilhewar had no idea what happened to require Bellmore to need the assistance of a walker. (Tr. 84)

Dr. Jilhewar later testified that Bellmore could have met or equaled a listing at the time he was issued the walker and cane. (Tr. 84) Dr. Jilhewar further agreed with Dr. Klemme's determination that Bellmore should be limited to a job which does not

require lifting more than 10 to 20 pounds and has a sit or stand option, 30 minutes each. (Tr. 85, 393, 410-413) He testified to an RFC and completed a medical source statement in which he further indicated that Bellmore should refrain from crouching and only occasionally stooping. (Tr. 410-13) Dr. Jilhewar raised concerns about Bellmore's marijuana use. (Tr. 85) He testified that marijuana was not a pain medicine, and yet that was the only thing Bellmore used in 2003 to relieve pain. (Tr. 85) On cross examination, Dr. Jilhewar testified that the pain that Bellmore complained of in his back "definitely" was consistent with the injury he suffered in the 2002 motorcycle crash. (Tr 85-86)

The vocational expert, Grzesik, testified that Bellmore could perform "none of his past work" and that Bellmore had "no transferrable skills." (Tr. 92) He further testified that there would be other work that Bellmore could perform such as unskilled sedentary jobs. (Tr. 92) Specifically, Grzesik testified that Bellmore could work as an "call-out operator," an "information clerk," or an "order clerk." (Tr. 92) Grzesik later testified that a hypothetical worker who had the same characteristics as Bellmore and required the need of an assistive device such as a cane or a rolling walker would not be able to perform any work. (Tr. 93) Grzesik stated his opinion was consistent with the DOT and the companion publications of the SCO except that the DOT did not provide for a sit/stand option. (Tr. 94) He later testified that he knew these jobs existed with a sit/stand option because he had placed other people in these

positions in the past. (Tr. 94) This testimony was not challenged by Bellmore or his counsel. (Tr. 95)

On November 29, 2007, the ALJ issued a partially favorable decision, finding Bellmore disabled after May 2, 2007, the day the VA issued him the rolling walker and cane. (Tr. 17-31) The ALJ considered the seven factors listed from SSR 96-7p in his opinion denying Bellmore's disability request. (Tr. 27) The ALJ then went through an extensive analysis of Bellmore's medical records, including clinical examinations showing little or no limitations between September 2002 and May 2007. (Tr. 27-28) Specifically, medical records from November 2006 led the ALJ to determine that Bellmore "was able to ambulate without an assistive device." (Tr. 28)

The ALJ stated in his report,

> I have made every reasonable effort to obtain available information that could shed light on the credibility of the claimant's statements regarding the nature and severity of his impairment(s) as relates to his activities of daily living, the location, duration, frequency, intensity of symptoms, the factors that exacerbate symptoms, the dosage and any claimed side-effects of his medication, his treatment, any other measures used other than treatment/medication, and any other factors concerning functional limitation (20 C.F.R. 404.1529(c)). I find that while the claimant undoubtedly may have experienced some pain, limitations, and restrictions from his impairments from January 9, 2002 through May 1, 2007, the medical record in its entirety demonstrates that during this period the claimant had no greater limitations in his ability to perform work activities than those reflected in the residual functional capacity reached in this decision.
>
> (Tr. 28)

The ALJ further determined that Bellmore's statements concerning "the intensity, duration and limiting effects of these symptoms are not entirely credible prior to May 2, 2007."  (Tr. 29)

The ALJ determined that Bellmore was not disabled under Sections 216(i) and 223(d) of the Social Security Act through June 30, 2005, the last date he was insured.  (Tr. 31)  The ALJ further determined that based on his application for supplemental security income filed on July 21, 2006, Bellmore was disabled under Section 1614(a)(3)(A) of the Social Security Act beginning on May 2, 2007.  (Tr. 31)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision

must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §404.1520, §416.920. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b), §416.920(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c), §416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments

13

listed in the regulations.  20 C.F.R. §401, pt. 404, subpt. P,
app. 1.  If it does, then the impairment is acknowledged by the
Commissioner to be conclusively disabling.  However, if the
impairment does not so limit the claimant's remaining capabili-
ties, the ALJ reviews the claimant's "residual functional capac-
ity" and the physical and mental demands of his past work.  If,
at this fourth step, the claimant can perform his past relevant
work, he will be found not disabled. 20 C.F.R. §404.1520(e),
§416.920(e).  However, if the claimant shows that his impairment
is so severe that he is unable to engage in his past relevant
work, then the burden of proof shifts to the Commissioner to
establish that the claimant, in light of his age, education, job
experience and functional capacity to work, is capable of per-
forming other work and that such work exists in the national
economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f),
§416.920(f).

The first issue that Bellmore raises is whether the ALJ
committed reversible error by failing to discuss specifically the
effects of Bellmore's obesity.  Bellmore argues that had the ALJ
considered his obesity, the ALJ may have reached a different
conclusion as to credibility, RFC, and meeting or equaling a
listed impairment.  He further argues that such error is not
harmless and should be remanded for reconsideration by the ALJ.

If a claimant is obese, the ALJ must address the "incremen-
tal effect" of obesity on the claimant's limitations.  **_Gentle v.
Barnhart_**, 430 F.3d 865, 868 (7th Cir. 2005).  Even if a claimant

14

does not contend that obesity is one of his impairments, SSR 02-1p requires an ALJ to consider the effects of obesity on the claimant's other conditions. However, failure to consider these effects explicitly can be "harmless error." ***Prochaska v. Barnhart***, 454 F.3d 731, 736 (7th Cir. 2006). Because the ALJ in ***Prochaska*** "sufficiently analyzed" the claimant's obesity (by implicitly considering the issue, in part by relying on medical documents that noted the claimant's height and weight), and because the claimant did not specify how obesity specifically impaired her work ability, the Seventh Circuit found that any error on the ALJ's part in not explicitly considering the claimant's obesity was harmless. ***Prochaska***, 454 F.3d at 737. *See **Skarbek v. Barnhart***, 390 F.3d 500, 504 (7th Cir. 2004) (ALJ's adoption of limitations suggested by doctors who were aware of claimant's obesity, plus claimant's failure in specifying how weight impaired the ability to work, was harmless error).

In ***Villano v. Astrue***, 556 F.3d 558, 560 (7th Cir. 2009), a case cited by Bellmore in his argument, the claimant was a woman who consistently had been diagnosed as morbidly obese. She was 5'7" tall and her weight fluctuated between 291 and 344 pounds. Villano argued that the ALJ failed to consider her obesity when he determined that she was not disabled. The Seventh Circuit found that the error was not harmless, based in part on the ALJ's failure to consider Villano's obesity but also based on flaws in the RFC analysis and the analysis of her ability to perform other jobs. ***Villano***, 556 F.3d at 562.

15

In *Skarbek*, 390 F.3d at 502, cited by the Commissioner in his argument, the claimant was of similar height and weight to Bellmore and also suffered knee problems. In that case, the ALJ determined that Skarbek was not disabled. At the time of his hearing, Skarbek was 6'1" tall and weighed 245 pounds and had a body mass index (BMI) of 32.3, which the Social Security Administration recognizes as a Level 1 obesity, the lowest of three levels. Skarbek claimed that the ALJ erred by failing to consider his weight in making his disability determination. Skarbek never explained how his obesity would have changed the ALJ's five-step analysis. Instead, he argued that the failure to consider the obesity was itself reason enough for remand. Social Security Ruling 02-1p requires an ALJ to consider the effects of obesity at multiple stages in the five-step process. *See* SSR 02-1p. The Seventh Circuit determined that although the ALJ did not specifically consider Skarbek's obesity, "it was factored indirectly into the ALJ's decision as part of the doctors' opinions." Because of this, it was determined that any remand for consideration of Skarbek's obesity would not change the outcome of this case. *Skarbek*, 390 F.3d at 504. *See also Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error review to ALJ's determination).

*Villano* is distinguishable from *Skarbek* because the plaintiff in *Villano* was morbidly obese and the ALJ made multiple errors in his determination of disability. In his reply brief, Bellmore argues that *Villano* was a later case and is controlling.

16

However, *Villano* can be distinguished from *Skarbek* because of the factual differences surrounding the two plaintiffs and because the ALJ committed multiple errors in *Villano*.

The facts of Bellmore's situation more closely resemble those of *Skarbek*. Both Skarbek and Bellmore are of similar height and weight. Like in *Skarbek*, Bellmore failed to explain how his obesity would have affected the outcome of the ALJ's five-step analysis. Furthermore, even though the ALJ did not explicitly comment on Bellmore's obesity, the medical professionals who examined Bellmore's records considered his height and weight. Much like *Skarbek*, the ALJ adopted the limitations and findings of the reviewing doctors who were aware of Bellmore's height and weight. Based on the similar facts of *Skarbek*, the ALJ did not commit reversible error by omitting a discussion of Bellmore's weight in his decision.

The second issue raised by Bellmore disputes the ALJ's credibility analysis. Bellmore argues that the ALJ improperly determined Bellmore to be not credible. Specifically, Bellmore questions whether the ALJ reasonably found Bellmore not fully credible in light of discrepancies between his allegations and the clinical record, as identified by the medical expert.

This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska,* 454 F.3d at 738 ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or

unsupported . . . can the finding be reversed.").  The ALJ's
"unique position to observe a witness" entitles his opinion to
great deference.  *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir.
1997).  *See also Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir.
2006)(holding same).  However, if the ALJ does not make explicit
findings and does not explain them "in a way that affords mean-
ingful review," the ALJ's credibility determination is not en-
titled to deference.  *Steele v. Barnhart*, 290 F.3d 936, 942 (7th
Cir. 2002).  Further, "when such determinations rest on objective
factors or fundamental implausibilities rather than subjective
considerations [such as a claimant's demeanor], appellate courts
have greater freedom to review the ALJ's decision."  *Clifford v.
Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

     The ALJ must determine a claimant's credibility only after
considering all of the claimant's "symptoms, including pain, and
the extent to which [the claimant's] symptoms can reasonably be
accepted as consistent with the objective medical evidence and
other evidence."  20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473
F.3d 816, 823 (7th Cir. 2007)("[S]ubjective complaints need not
be accepted insofar as they clash with other, objective medical
evidence in the record.");  *Scheck v. Barnhart*, 357 F.3d 697, 703
(7th Cir. 2004).  If the claimant's impairments reasonably could
produce the symptoms of which the claimant is complaining, the
ALJ must evaluate the intensity and persistence of the claimant's
symptoms through consideration of the claimant's "medical his-
tory, the medical signs and laboratory findings, and statements

from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. §404.1529(c); *Schmidt*, 395 F.3d at 746-47 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)(same); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)

*See also* *Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001) (same).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2; *Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (*quoting* *Clifford*, 227 F.3d at 872. When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting. *See* *Zurawski*, 245 F.3d at 888 (*quoting* *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §404.1527(d)(2). *See also Schmidt*, 496 F.3d at 842; *Gudgell v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford*, 227 F.3d at 870 *(quoting Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)). *See also* 20 C.F.R. §404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

SSR 96-7p states that there is a two-step process that the ALJ must engage in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)-i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques-that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

21

Second, once an underlying physical or [mental impairment](s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record. (emphasis added)

SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

This assessment continues:

> Moreover, 20 C.F.R. §404.1529(c)(3) states
> that when a claimant's subjective individual
> symptoms, such as pain, are considered, sev-
> eral factors are relevant including: (1) the
> individual's daily activities; (2) the loca-
> tion, duration, frequency, and intensity of
> the individual's pain or other symptoms; (3)
> factors that precipitate and aggravate the
> symptoms; (4) the type, dosage, effective-
> ness, and side effects of any medication the
> individual takes or has taken to alleviate
> pain or other symptoms; (5) treatment, other
> than medication, the individual receives or
> has received for relief of pain or other
> symptoms; (6) any measures other than treat-
> ment the individual uses or has used to re-
> lieve pain or other symptoms; and (7) any
> other factors concerning the individual's
> functional limitations and restrictions due
> to pain or other symptoms. 20 C.F.R.
> §404.1529(c)(3)(i)-(vii).
>
> ***Adams v. Astrue***, 650 F.Supp.2d 838, 847-48
> (S.D. Ind. 2009) (*quoting* 20 C.F.R.
> §404.1529(c)(3)(i)-(vii))

Bellmore argues that the ALJ did not comply with the analy-
sis under SSR 96-7p. He claims that the ALJ failed to relate
pain and Bellmore's daily activities to his allegations of
disability.[1] He further states that the ALJ offered no analysis
as to the effects of Bellmore's medication or obesity.[2] Bellmore
further argues that the ALJ never considered other factors, as

---

[1] The plaintiff's brief states that the ALJ's decision leaves two
sentences incomplete following the recitation of SSR 96-7p. (Tr. 27) Upon
further review of this section of the record it appears that the ALJ was using
boiler plate language. At some point in the editing process this boiler plate
language was mistakenly not removed. If one continues to read the paragraph
in question, both "incomplete" sentences are substantively completed.

[2] The record clearly details Bellmore's repeated illicit drug use. (Tr.
395) The ALJ found it unnecessary to confront this issue when determining
Bellmore's credibility. During testimony at the hearing, Dr. Jilhewar stated
that marijuana was not a pain medicine.

required by SSR 96-7p, nor did the ALJ indicate how these factors were significant.  Finally, Bellmore argues that the ALJ failed to consider the consistency of his statements when determining credibility.

In *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), a case cited by Bellmore in his reply brief, the Seventh Circuit concluded that the ALJ had "questionable credibility findings" in his determination that the claimant was not disabled.  In that case, the claimant suffered from type-2 diabetes and claimed that she was disabled because of symptoms of the disease.  In June 2007, the ALJ determined that the claimant was not disabled in part on the fact that he determined she was not credible.  The ALJ held that Myles' claims of urinary frequency were unbelievable because she had not complained about them to a physician since January 2005.  The ALJ further stated that the claimant had not complied with her treatment, which rendered her claims of severe symptoms less credible.  The Seventh Circuit determined that the "ALJ did not analyze key facts in regard to her symptoms, particularly in regard to urinary frequency and hand problems."  The Seventh Circuit further stated, "It is not that the error requires a different finding; rather, the ALJ's basis for his credibility determination on this issue is wrong, and so the ALJ must reconsider the credibility determination in light of the evidence."  582 F.3d at 676.  *See also Allord*, 455 F.3d at 822.  The court further stated that the ALJ was "required by Social Security Rulings to consider explanations for instances

where Myles did not keep up with her treatment, and he did not do so."  582 F.3d at 677; SSR 96-7p, *7.

In *Villano*, a case cited in Bellmore's reply brief, the Seventh Circuit stated that "[i]n determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations."  556 F.3d at 562.  The Seventh Circuit held that the ALJ "failed to build a logical bridge between the evidence and his conclusion that Villano's testimony was not credible."  556 F.3d at 562.  The court continued that although the ALJ briefly described the claimant's testimony about her daily activities, he failed to explain whether the claimant's daily activities were consistent with the pain that she claimed.  556 F.3d at 562.

In *Elder v. Astrue*, 529 F.3d 408 (7th Cir. 2008) another case cited by Bellmore, the Seventh Circuit held, "It is only when the ALJ's determination lacks any explanation or support that [a court] will declare it to be 'patently wrong.'" 529 F.3d at 413-14 (*citing Jens*, 347 F.3d at 213).  In *Elder*, the claimant suffered from fibromyalgia and filed for Disability Insurance Benefits and Supplemental Security Income claiming that she was disabled because of the disease.  The claimant testified in her hearing before the ALJ that her fibromyalgia caused her pain that sapped her energy, led her to depression, and prevented her from doing "anything."  The ALJ denied Elder's claims at two separate hearings.  On appeal, Elder challenged the ALJ's determination

25

that her testimony was not credible.  The Seventh Circuit determined that the "ALJ clearly provided a reason for his adverse credibility determination:  he stated that Elder's testimony regarding the severity of her fibromyalgia and depression contradicted what she told" her treating physician.  529 F.3d at 414.

*Adams v. Astrue,* 650 F.Supp.2d 838 (S.D. Ind. 2009), dealt with a very similar issue.  In **Adams**, the claimant filed for Disability Insurance Benefits on August 24, 2005, alleging disability since March 2005.  On February 24, 2008, an ALJ issued his opinion declaring that the claimant was not disabled "because he retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy."  650 F.Supp.2d at 839.  The claimant then sought judicial review, raising as one of his issues whether the ALJ failed to follow SSR 96-7p regarding his credibility.  During its analysis, the district court stated that the "'credibility' decision is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain.  Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner, to assess and report credibility issues, as well as 20 C.F.R. §404.1529(c)(3)."  650 F.Supp.2d at 847.  The court noted that the ALJ did explicitly mention SSR 96-7p and also listed the seven required factors to consider.  The court further stated that although the one paragraph listing these factors taken in isolation appeared conclusory, by reading the following paragraphs the "Magistrate Judge can trace the path of the ALJ's

reasoning and believes the ALJ considered other medical evidence
as it relates to complaints of pain." 650 F.Supp.2d at 848.
Because the ALJ's analysis was not "patently wrong," the court
did not reverse the ALJ's determination. 650 F.Supp.2d at 849.

*Myles* is distinguishable from the situation involving
Bellmore because here the ALJ did include the seven factors
listed from SSR 96-7p in his opinion denying Bellmore's disabil-
ity request. After listing these seven factors, the ALJ went
through an extensive analysis of Bellmore's medical records,
including clinical examinations showing little or no limitations
between September 2002 and May 2007. During the last examination
before the ALJ determined Bellmore's disability started, in
November 2006, Bellmore was "able to ambulate without assistive
device." Furthermore, the ALJ considered the testimony of Dr.
Jilhewar who stated that Bellmore's ability to walk on his toes
and on his heels and to tandem walk was inconsistent with a need
for an assistive device.

*Villano* is distinguishable on similar grounds. The ALJ
hearing Bellmore's case did in fact question him about his daily
activities. Furthermore the ALJ asked Bellmore about the level
of pain he was experiencing in terms of a scale from 1 to 10.
Also the ALJ found that although Bellmore "undoubtedly may have
experienced some pain, limitations, and restrictions from his
impairments from January 9, 2002 through May 1, 2007, the medical
record in its entirety demonstrates that during this period the
claimant had no greater limitations in his ability to perform

27

work activities than those reflected in the residual functional capacity reached in this decision." (Tr. 28) This makes it apparent that the ALJ considered Bellmore's testimony but chose to put more emphasis on the medical evidence.

*Adams* involves a nearly identical situation to Bellmore. In *Adams*, the court found that while a paragraph standing alone may appear conclusory, the entire record should be considered before overturning the ALJ's decision. The ALJ in Bellmore's case did just that. He stated, "Based upon this record in its entirety, including the testimony of the claimant, I find the opinions of the medical expert to be the most informed, convincing, consistent with the medical evidence and consistent with the record as a whole, and generally consistent with the residual functional capacity I have assessed herein." (Tr. 28) Furthermore, the defendant pointed to Bellmore's demonstration of positive Waddell signs, suggesting symptom magnification. The ALJ has clearly offered an explanation and cites to the medical records to support his decision. Therefore, based on the reasoning of *Elder*, the ALJ's opinion should stand.

The third issue that Bellmore presents is whether the ALJ improperly found that his conditions did not meet or equal a listing. Specifically, did the ALJ reasonably rely on the medical expert and state agency physicians to find that Bellmore did not meet or equal a listing until May 2007, when no physician indicated otherwise?

The listings of impairments describe those impairments that are considered presumptively disabling when specific criteria are met. *See* 20 C.F.R. §404.1525(a). If an impairment is not the same as a listed impairment, the ALJ must determine whether the impairment is medically equivalent to a listed impairment. 20 C.F.R. §404.1529(d)(3). Where a claimant has a "combination of impairments, no one of which meets a listing," "we will compare your findings with those for closely analogous impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing." 20 C.F.R. §404.1526(b)(3).

The regulations provide that, in making this determination,

> [we] will consider medical equivalence based on all evidence in your case record about your impairment(s) and its effects on you that is relevant to this finding. In consid- ering whether your symptoms, signs, and labo- ratory findings are medically equal to the symptoms, signs, and laboratory findings of a listed impairment, we will look to see whe- ther your symptoms, signs and laboratory findings are at least equal in severity to the listed criteria. However, we will not substitute your allegations of pain or other symptoms for a missing or deficient sign or laboratory finding to raise the severity of your impairment(s) to that of a listed im- pairment. If the symptoms, signs, and labo- ratory findings of your impairment(s) are equivalent in severity to those of a listed impairment, we will find you disabled. If it does not, we will consider the impact of your symptoms on your residual functional capac- ity.

> 20 C.F.R. §404.1529(d)(3)

*See also* 20 C.F.R. §404.1526(a) (stating that an impairment "is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment").  The responsibility for deciding medical equivalence rests with the ALJ.  20 C.F.R. §404.1526(e).

When a claimant contends he has an impairment that meets or equals a listed impairment, the burden is on the claimant to show how the impairment meets or equals the listing.  ***Maggard v. Apfel***, 167 F.3d 376, 380 (7th Cir. 1999).  The Supreme Court has emphasized that, "for a claimant to show that his impairment matches a listing it must meet *all* of the specified medical criteria."  ***Sullivan v. Zebley***, 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990) (emphasis in original). *See also* ***Sims,*** 309 F.3d at 428 (relying on same).  A claimant must meet the criteria in the capsule definition, as well as the criteria in the subsidiary paragraphs.  ***Blakes ex rel. Wolfe v. Barnhart***, 331 F.2d 565, 570 (7th Cir. 2003); ***Scott***, 297 F.3d at 595 n.6.  An impairment that manifests only some of the specified criteria, no matter how severely, does not qualify.  ***Zebley,*** 493 U.S. at 530.

Bellmore argues that his condition does meet or equal Listing 1.02, which states:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging

of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.02

The inability to ambulate effectively is defined in 1.00B2b as,

> (1) Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00 B(2)(b)

Bellmore argues that he met the listing for 1.02A. Specifi-
cally he points to the fact that he had a major dysfunction of a
major weight bearing joint, characterized by gross anatomical
deformity. He argues that his right knee patellectomy qualified
him to meet this standard. Although this injury meets the first
part of the requirement for listing 1.02A, Bellmore fails when it
comes to the second part. 20 C.F.R. Pt. 404, Subpt. P, App. 1,
1.00 B(2)(b) lists examples of ineffective ambulation. The
testimony of Dr. Jilhewar at the ALJ hearing indicated that
Bellmore did not meet or equal a listed impairment because of his
demonstrated ability to walk on his heels and on his toes and
tandem walk, which was inconsistent with the need for an assis-
tive device. Dr. Jilhewar testified that these results were not
consistent with the need for a walker. In November 2006, Bell-
more's treating physician reported that he was "able to ambulate
effectively without assistive device." Bellmore's own testimony
established that he lived alone and was able to do his own shop-
ping and cleaning. No physician ever indicated that Bellmore
could not walk without a walker or could not ambulate effec-
tively, and the ALJ nevertheless found Bellmore disabled as of
the date he procured a cane and walker from the VA without any
medical notes showing a need for such device. Substantial evi-
dence thus supports the ALJ's finding, and Bellmore's argument is
unpersuasive.

Bellmore also argues that he equaled listing 1.04B, specifically because he was ordered to change positions from sitting to standing every 30 minutes.  Listing 1.04 states:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
>> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>>
>> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>>
>> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

> 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.04

However, Bellmore also admits in his brief that he "doesn't have all of the criteria to specifically meet any of the three subsections." (Pltf. Brief, p. 15)  Bellmore attempts to counter this by claiming that the ALJ failed to perform a medical equivalence analysis under 20 C.F.R. §404.1526(b)(3).  This section states:

> If you have a combination of impairments,
> no one of which meets a listing (see
> §404.1525(c)(3)), we will compare your find-
> ings with those for closely analogous listed
> impairments. If the findings related to your
> impairments are at least of equal medical
> significance to those of a listed impairment,
> we will find that your combination of impair-
> ments is medically equivalent to that list-
> ing.

Bellmore argues that his pain, limitation of range of motion, muscle weakness, positive straight leg raising test and chronic non-radicular pain and weakness combined should equal the listing under this section.  This fails however, because these impairments fail to reach the severity required under the Regulation. The Regulation further states, "When we determine if your impairment medically equals a listing, we consider all evidence in your case record about your impairment(s) and its effects on you that is relevant to this finding . . . .  We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner."  20 C.F.R. §404.1526(c).  Therefore, the ALJ was justified in relying on the testimony of the medical expert, Dr. Jilhewar, that Bellmore did not meet or equal a listing before May 2, 2007.

The fourth issue that Bellmore raises is whether the ALJ failed to comply with SSR 00-4p.  Specifically, did the ALJ reasonably rely on the vocational expert's testimony that jobs could be performed with a sit/stand option, when, as the vocational expert explained, the Dictionary of Occupational Titles is silent on such a requirement and the vocational expert has per-

sonally placed people with sit/stand limitations in the identi-
fied positions?

After determining Bellmore's work related limitations, the
ALJ found that he still could perform a number of jobs that
existed in the national economy before May 2007.  The ALJ posed
hypothetical questions to the vocational expert that reflected
the RFC finding, and the vocational expert testified that there
were a significant number of jobs that such a person could per-
form.  Grzesik's testimony thus satisfied the Agency's burden at
step five.

Bellmore challenges the vocational expert testimony based on
SSR 00-4p and the *Dictionary of Occupational Titles* ("DOT").
Bellmore asserts that the vocational expert's testimony "must be
consistent with the DOT," and that the vocational expert testi-
mony was not consistent with the DOT because the DOT does not
provide for a sit/stand option. (Pltf. Br. p. 16)  The Seventh
Circuit found in ***Zblewski v. Astrue***, 302 F.App'x 488, 494 (7th
Cir. Dec. 15, 2008), that "[b]ecause the DOT does not address the
subject of sit/stand options, it is not apparent that the testi-
mony conflicts with the DOT."  The court continued that even if
there was an error in failing to comply with SSR 00-4p, that
error was harmless because "the ALJ was entitled to rely on
other, unchallenged VE testimony."  302 F.App'x at 494.  Grzesik
testified that there were multiple jobs available with a
sit/stand option.  Bellmore's counsel failed to object to this
testimony and did not cross examine the VE.  As a result, the ALJ

35

was entitled to rely on this unchallenged testimony. 302 F.App'x at 494.

Even if there was a conflict, Bellmore's underlying premise is flawed because SSR 00-4p explains that, "[n]either the *DOT* nor the VE or VS evidence automatically 'trumps' when there is a conflict." Instead, SSR 00-4p simply instructs an ALJ to ask any testifying vocational expert whether his testimony conflicts with the DOT and then to resolve any "apparent" conflicts. Here, the ALJ properly asked the vocational expert whether there was a conflict between his testimony and the DOT. The VE testified that there were no inconsistencies, but that the DOT did not address sit/stand options. The ALJ asked Grzesik how he knew the jobs could be performed, and he responded that he had placed people in similar positions and knew that these positions allowed for a sit/stand option. Therefore, the ALJ reasonably could rely on the uncontested testimony of the vocational expert.

————————————

For the aforementioned reasons, the decision of the Commissioner of the Social Security Administration is **AFFIRMED.**

ENTERED this 25th day of March, 2010.

s/ ANDREW P. RODOVICH
United States Magistrate Judge